Clifford J. Heath, et al. [1] v. Commissioner. Heath v. Commissioner
Docket Nos. 1879-64, 1880-64, 1881-64, 5342-67, 1273-68, 1274-68.
United States Tax Court
T.C. Memo 1971-129; 1971 Tax Ct. Memo LEXIS 202; 30 T.C.M. (CCH) 545; T.C.M. (RIA) 71129; June 3, 1971, Filed Raymond E. Caruso, 73 Monmouth St., Redbank, N.J. for the petitioners. Alan M. Stark, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income taxes and additions to tax of petitioner Clifford J. Heath for the years and in the amounts as follows: Additions to tax
Under Sec.
Under Sec.
Under Sec.
Docket
Deficiency in
6651(a)
6653(a)
6653(b)
No.
Year
income tax
I.R.C. 1954
I.R.C. 1954
I.R.C. 1954
1879-64
1959
$ 3,571.00
$ 1,785.50
1960
2,082.04
1,041.02
1961
163,744.08
81,872.04
1962
6,328.17
3,164.09
5342-67
1963
6,783.84
$1,356.77
$339.19
*203 By amendment to answer, respondent made claim for increased deficiencies in this petitioner's income taxes and additions to tax for the years 1959, 1960, 1962, and 1963 as follows: Increased
additions to
tax
Increased
Under Sec.
Under Sec.
Under Sec.
Docket
deficiency in
6651(a)
6653(a)
6653(b)
No.
Year
income tax
I.R.C. 1954
I.R.C. 1954
I.R.C. 1954
1879-64
1959
$ 1,532.17
$ 766.09
1960
66,523.18
33,261.59
1962
3,066.99
1,533.49
5342-67
1963
931.62
$186.32
$46.58
Respondent by amendment to answer, further alleged in the alternative increased deficiencies in this petitioner's income tax and additions to tax for the years 1959, 1960, and 1962 as follows. [2]
Addition to tax under
Increased deficiency
Sec. 6653(b),
Docket No.
Year
in income tax
I.R.C. 1954
1879-64
1959
$ 4,235.40
$ 2,117.70
1960
71,394.40
35,697.20
1962
2,497.66
1,248.83
Respondent determined deficiencies *204 in the income taxes and additions to tax of petitioner Beatrice H. Heath for the calendar years 1951 and 1954 through 1962 in the amounts as follows: Under Sec.
291(a)
Docket
Deficiency in
I.R.C.
No.
Year
income tax
1939
1273-68
1951
$ 34,246.00
$8,561.50
1274-68
1954
818.00
1955
3,033.20
1956
1,473.45
1957
1,937.50
1958
108,616.00
1959
3,001.30
1960
77,903.90
1961
1,174.76
1962
1,577.51
Additions to Tax
Under Sec.
Under Sec.
Under Sec.
Under Sec.
293(b)
294(d)(1)(A)
6653(b)
6654
Docket
I.R.C.
I.R.C.
I.R.C.
I.R.C.
No.
1939
1939
1954
1954
1273-68
$17,123.00
$3,082.14
1274-68
75.67
$ 409.00
1,516.60
$ 84.93
736.73
41.26
968.75
54.25
54,308.00
3,041.46
1,500.65
84.03
38,951.95
2,181.31
587.38
32.89
788.76
44.16
Respondent by amended answer claimed increased deficiencies in the income taxes and additions to tax of petitioner Beatrice H. Heath for the calendar years 1954 through 1957, 1959, 1961, and 1962, as follows: Increased additions
to tax
Increased
Under Sec.
Under Sec.
Under Sec.
deficiency in
294(d)(1)(A)
6653(b)
6654
Docket No.
Year
income tax
I.R.C. 1939
I.R.C. 1954
I.R.C. 1954
1274-68
1954
$ 96.44
$143.60
$ 48.22
1955
327.19
163.60
None
1956
1,635.38
2,333.90
$58.03
1957
256.95
122.48
8.35
1959
4,805.10
1,402.55
None
1961
6,048.92
3,024.46
None
1962
7,248.32
3,624.16
None
*205 Respondent determined deficiencies in the income taxes and additions to tax of petitioner Warwick Corporation for the calendar years 1954 through 1962 in the following amounts: Addition to
tax under
Docket
Deficiency in
Sec. 6653(b)
No.
Year
income tax
I.R.C. 1954
1880-64
1954
$18,501.67
$ 9,250.84
1955
2,550.14
1,275.07
1956
17,045.03
8,522.52
1957
17,183.25
8,591 .63
1958
6,349.07
3,174.54
1959
1,797.75
898.88
1960
1,320.99
660.50
1961
59,659.72
29,829.86
1962
1,363.98
681.99
Respondent by amended answer claimed increased deficiencies in the income taxes and additions to tax of petitioner Warwick Corporation for the calendar years 1954, 1957, and 1958 as follows: Increased
addition to
Increased
tax under
Docket
deficiency in
Sec. 6653(b)
No.
Year
income tax
I.R.C. 1954
1880-64
1954
$ 1,520.53
$ 760.26
1957
26,512.97
13,256.48
1958
5,922.16
2,961.08
Respondent determined deficiencies in the income taxes and additions to tax of petitioner Campla Corporation for the calendar years 1959 through 1962 in the following amounts: Addition to
tax under
Docket
Deficiency in
Sec. 6653(b)
No.
Year
income tax
I.R.C. 1954
1881-64
1959
$ 5,610.74
$ 2,805.37
1960
4,523.19
2,261.59
1961
459.06
229.53
1962
743.03
371.51
*206 Some of the issues raised by the pleadings have been conceded by respondent, [3] leaving for our decision the following: (1) Whether the Federal income tax returns filed in the name of Clifford J. Heath only for the calendar years 1954 and 1956 through 1962 were in fact joint returns of Clifford J. Heath and his wife, Beatrice H. Heath. [4]
(2) Whether Clifford J. Heath is entitled to deduct as ordinary and necessary business expenses for the taxable year 1959 all or any part of $13,544.55 paid to his son in that year. (3) Whether an amount of $8,768.63 claimed by Clifford J. Heath as a deduction for real estate taxes for the taxable year 1960 is properly deductible or should be treated as an additional cost of a mortgage on the property with respect to which the taxes were paid. (4) Whether petitioner Clifford J. Heath properly took a deduction for $2,000 in 1960 and $18,080.29 in 1961 as debts owed to him by Heathcliff, Inc., which became worthless in those years. (5) Whether respondent properly disallowed $2,142.68 of interest expense claimed by petitioner Clifford J. Heath in 1959, $448.92 of depreciation on an automobile claimed by petitioner Clifford J. Heath in 1961 *207 and $1,279.50 of legal fees claimed to be deductible by petitioner Clifford J. Heath in that year, which amount respondent capitalized as additional cost of acquiring a motel property. (6) Whether petitioner Clifford J. Heath's income was understated in 1962 by $28,721.44 by reason of the fact of this petitioner's deducting an amount on his return which was attributable to another taxable entity. (7) Whether petitioner Clifford J. Heath in 1961 omitted from his reported income an amount of $2,000 of sales of his sole proprietorship, Precipitation Associates of America. (8) Whether petitioner Clifford J. Heath is entitled to a net operating loss carryover deduction in 1963 of $36,209.60. 550 (9) Whether petitioner Clifford J. Heath realized a net profit of $4,518.50 from the operation of a motor lodge in 1963 instead of the $373.03 reported as profit from this operation on his 1963 income tax return. (10) Whether petitioner Clifford J. Heath is liable for the addition to tax for negligence under section 6653(a), I.R.C. 1954, for the taxable year 1963. (11) Whether the return filed by petitioner Clifford J. Heath for the taxable year 1959 was *208 false and fraudulent with intent to evade tax. (12) Whether petitioner Beatrice H. Heath received income in the various years 1954 through 1962 as determined by respondent and if so are the resulting deficiencies for the years 1954 through 1958 barred by the statute of limitations. [5]
(13) Whether respondent properly determined that petitioner Beatrice H. Heath, or in the alternative petitioner Clifford J. Heath, realized gain on the foreclosure of the mortgage on the Rose Motel in the taxable year 1960 in the amount of $60,632.37. (14) Whether respondent properly determined that petitioner Beatrice H. Heath was liable in each of the years 1956 through 1962 for additions to tax under section 6654(a), I.R.C. 1954, for failure to pay individual estimated income tax. (15) The extent to which petitioner Warwick Corporation understated its income from sales in the years 1954 through 1962. [6]
(16) Whether respondent properly disallowed $712.50 for repairs and $2,300 for interest claimed to be deductible by petitioner Warwick Corporation for the taxable year 1959 and $1,546.60 of interest for the taxable year 1962. (17) Whether petitioner Warwick Corporation *209 properly claimed a deduction for a bad debt owed to it by Heathcliff, Inc., in the amount of $1,500 in 1960 and $1,920 in 1961. (18) Whether the income tax returns filed by petitioner Warwick Corporation for the taxable years 1954 through 1957 were false and fraudulent so as to remove the bar of the statute of limitations on assessment of tax for those years and cause the corporation to be liable for additions to tax for fraud. (19) If the return of petitioner Warwick Corporation for the taxable year 1957 was not false and fraudulent, then was there an omission of 25 percent of gross income so that the 6-year statute of limitation is applicable to the assessment of the deficiency, thereby causing the respondent's determination of deficiency to be timely. (20) Whether petitioner Campla Corporation understated its recipts from sales of realty for the taxable year 1959 in the amount of $1,378.46 and overstated the costs attributable to its sales in that year by the amount of $16,050. (21) Whether petitioner Campla Corporation understated its income for the taxable year 1961 in the amount of $28,745.19 by deducting costs on its return which were in fact the costs of another taxable *210 entity. (22) Whether respondent properly disallowed to petitioner Campla Corporation a deduction for interest expense in the amount of $3,221.76 for the taxable year 1962. *211 Findings of Fact Some of the facts were stipulated orally at the trial and are found accordingly. Petitioner Clifford J. Heath (hereinafter referred to as Clifford, Sr.,) resided at Spring Lake, New Jersey at the time of the filing of his petition in this case. Petitioner Beatrice H. Heath (hereinafter referred to as Beatrice), the wife of Clifford, Sr., resided at Spring Lake, New Jersey at the time of the filing of her petition in this case. 551 Petitioner Warwick Corporation (hereinafter referred to as Warwick) is a New Jersey corporation organized in 1933 with capital of $1,000 represented by 10 shares of stock. Five shares were issued to Clifford, Sr., and 5 shares to Beatrice. Warwick's principal place of business at the time of the filing of its petition in this case was at Spring Lake, New Jersey. It filed its Federal corporate income tax returns for the calendar years 1954 through 1962 with the district director of internal revenue at Newark, New Jersey. Petitioner Campla Corporation (hereinafter referred to as Campla) is a New Jersey corporation organized sometime prior to 1959. Its principal place of business at the time of the filing of its petition in *212 this case was Spring Lake, New Jersey. Campla's total stock consisted of 10 shares of common stock, 5 of which were owned by Clifford, Sr., and 5 by Beatrice. It filed its Federal corporate income tax returns for the calendar years 1959 through 1962 with the district director of internal revenue at Newark, New Jersey. Clifford, Sr., and Beatrice were the only officers as well as the sole stockholders of both Warwick and Campla during all the years here in issue. Except for the year 1955 the returns filed by Clifford, Sr., contained at the top in the place specified for the name of the taxpayer filing the return only the name of Clifford, Sr. These returns were signed only by Clifford, Sr. On the return for the calendar year 1962 under the instructions to check the appropriate box to indicate whether the return was a joint or separate return, the box indicating the return to be of a married person filing a separate return was checked. On the return filed in the name of Clifford, Sr., for the calendar year 1954 income from dividends in the amount of $2,438.60 was reported. These dividends were on stock owned by Beatrice. Interest income from Warwick in the amount of $4,858.20 was *213 reported on this return. Warwick on its Federal income tax return for the year 1954 claimed a deduction for interest in the total amount of $5,263.21. Respondent in his notice of deficiency to Beatrice determined that she received $4,500 in interest from Warwick in the year 1954. Prior to 1954 Beatrice had lent money to Warwick and this loan or part of this loan was outstanding and remained unpaid to Beatrice until at least 1958. On the income tax return filed by Clifford, Sr., in 1955, which respondent concedes to be a joint return of Clifford, Sr., and Beatrice, $2,688.47 of dividend income was reported, which represented dividends on stock owned by Beatrice, and interest from Warwick of $5,147 was reported. Warwick on its Federal income tax return filed for the year 1955 claimed a deduction for interest paid to Beatrice of $5,757.12, and respondent in his notice of deficiency to Beatrice determined that she received interest from Warwick of $5,640. The interest deduction claimed by Warwick for interest paid to Beatrice was the total interest deduction claimed by Warwick for the year 1955. On the income tax return filed in the name of Clifford, Sr., for the calendar year 1956 *214 dividend income of $3,317.40 representing dividends on stock owned by Beatrice was reported and income and interest from Warwick of $3,838.15 was reported. Warwick on its Federal corporate income tax return for the calendar year 1956 claimed a total deduction for interest paid of $3,838.15. Respondent in his notice of deficiency to Beatrice determined this same amount as interest received by Beatrice for the year 1956 from Warwick. For the calendar year 1957 dividends of $4,062 received on stock owned by Beatrice were reported on the return filed in the name of Clifford, Sr., and interest from Warwick of $5,525 was reported which was the total amount of interest deducted by Warwick on its return for the year 1957 and which was the exact amount of interest received by Beatrice from Warwick for the year 1957 shown by respondent in his notice of deficiency to Beatrice. The return filed in the name of Clifford, Sr., for the calendar year 1958 reported dividends which were received on stock owned by Beatrice of $6,378.46 and reported income from interest from Warwick of $2,080.22. On its 1958 income tax return Warwick claimed a total deduction for interest of $2,400 and respondent in *215 his notice of deficiency to Beatrice showed her as having received $2,400 from Warwick for this year. On the income tax return filed in the name of Clifford, Sr., for the calendar year 1959, dividends from stock in the amount of $5,120.54 were reported. These dividends were on stock owned by Beatrice. On the income tax return filed in the name of Clifford, Sr., for the calendar year 552 1960, dividends in the amount of $1,616.08 were reported. These dividends were paid with respect to stock owned by Beatrice. Interest income was reported on this return from Palisades Mortgage Corporation in the amount of $3,081.58. Respondent in his notice of deficiency to Beatrice determined that she received dividend income from Palisades Mortgage Corporation in 1960 in the amount of $3,000 but no interest income for this year from this corporation. This return also reported interest income from Daniel Randall, J. Johnson, and Rosario Martelli. Respondent determined that Beatrice received interest income from mortgages from Randall and Johnson in 1959 and received income from foreclosure of a mortgage due her from Rosario and Rose Martelli in 1960. For the calendar year 1961 on the income *216 tax return filed in the name of Clifford, Sr., dividend income in the amount of $4,425.81 was reported. These dividends were received with respect to stock owned by Beatrice. Interest income of $3,000 was reported in the year 1961 from Palisades Mortgage Corporation and from Daniel Randall and Bernice J. Johnson in the total amount of $3,889.77. Respondent in his notice of deficiency determined that Beatrice received $3,000 of dividend income from Palisades Mortgage Corporation in 1961. On the income tax return filed in the name of Clifford, Sr., for the calendar year 1962 dividend income in the amount of $16,162.55 was reported. These dividends were received with respect to stock owned by Beatrice. On this return interest income from Campla in the amount of $3,221.76 was reported. Campla on its Federal income tax return for the calendar year 1962 deducted a total amount of interest paid of $3,221.76 which it showed to have been paid to Beatrice and this is the amount of interest income from Campla which respondent determined in his notice of deficiency to Beatrice that she received in 1962. Clifford, Sr., on the income tax return filed in his name for the calendar year 1963 reported *217 interest from both Warwick and Campla. On several of the income tax returns filed by Clifford, Sr., for the years 1954 through 1963, Beatrice's name appeared in the space designated to state the name of "wife." Beatrice helped Clifford, Sr., prepare the Federal income tax returns filed in his name for the years 1954 through 1962. She furnished information as to her income and both she and Clifford, Sr., intended to include all her income in the returns filed in the name of Clifford, Sr. Personal exemptions for both Beatrice and Clifford, Sr., were claimed on each of the returns for the years 1954 through 1962. During 1959 and for a number of years prior thereto Clifford, Sr., operated a sole proprietorship known as Precipitation Associates of America. This business consisted of the sale of dust control equipment to various plants. For sometime prior to 1958 the son of Clifford, Sr., Clifford J. Heath, Jr. (hereinafter referred to as Clifford, Jr.) had been engaged in a business in corporate form under the name of Heathcliff, Inc. In 1958 the assets of Heathcliff, Inc. were turned over to a receiver in an arrangement for the benefit of creditors. During 1958 some of the creditors *218 attempted to obtain relief from Clifford, Jr., for amounts they believed they were not going to obtain from Heathcliff, Inc., and during 1959 some of these creditors attempted to obtain judgments against Clifford, Jr., personally. Clifford, Jr., turned over all of his personal assets including his home to the creditors of Heathcliff, Inc. The final settlement with creditors of Heathcliff, Inc., was not made until 1961. During 1959 Clifford, Jr., had no bank account and owned no property in his own name. The automobile used by Clifford, Jr., and his wife was in his wife's name. Clifford, Jr., had obtained a position as a commissioned salesman for Ballard Asphalt Company and traveled in Pennsylvania, New Jersey, Delaware, and the six New England States attempting to sell on a commission basis the asphalt products produced by Ballard Asphalt Company. His agreement with Ballard Asphalt Company was a straight commission agreement with no provision for reimbursement for expenses. In 1959 Clifford, Jr., made an agreement with his father that he would attempt to solicit business for the dust control equipment which his father sold under the name of Precipitation Associates of America from *219 the same plants he visited in his efforts to sell asphalt products. There was no conflict in Clifford, Jr.'s attempting to sell both the products sold by his father's 553 business and the asphalt products. Although no actual sales of dust control equipment resulted in 1959 from the efforts of Clifford, Jr., there were sales totaling approximately $50,000 in later years made by Precipitation Associates of America to companies that Clifford, Jr., had visited and consulted on behalf of his father's business during 1959. Clifford, Jr., during 1959 also on occasions furnished engineering advice to plants which had purchased and installed the products sold by Precipitation Associates of America. Clifford, Jr., kept a record of the total expenses he incurred during 1959. The total amount of the expenses on Clifford, Jr.'s records which he submitted to Precipitation Associates of America as an expense account in 1959 was $9,800. This amount included a claimed mileage reimbursement for the total mileage the car registered in the name of Clifford, Jr.'s wife was driven during the year 1959. During the year 1959 Beatrice at the direction of Clifford, Sr., signed checks in blank and gave *220 them to Clifford, Jr.'s wife, Barbara, to write for the various household and other expenses of herself and Clifford, Jr., and their two children. The payee of some of the checks was Barbara and the payees of other of the checks were grocery stores, clothing stores, utility companies, and the like. The total amount of such checks during the year 1959 drawn by Beatrice on the account of Precipitation Associates of America to Barbara or on Barbara's behalf was $13,544.55. In computing his income from Precipitation Associates of America for the year 1959 Clifford, Sr., claimed as a deduction for salary paid to Clifford, Jr., the amount of $13,544.55. Palisades Mortgage Corporation (hereinafter referred to as Palisades) was a New Jersey corporation organized on August 9, 1951. Originally it had six shareholders including Clifford, Sr., each of whom owned 800 shares of stock. Clifford, Sr., assigned a $20,000 mortgage to Palisades in return for his 800 shares of stock and each of the other shareholders contributed $20,000 cash for their shares. On September 6, 1951, Beatrice transferred certain real property located at 25 Broad Avenue, Palisades Park, New Jersey to Palisades in exchange *221 for 600 shares of Palisades preferred 5% stock with a par value of $100 per share. On December 8, 1955, Beatrice exchanged her 600 shares of 5% preferred stock of Palisades for a $60,000 note of Palisades bearing interest at 5% per annum. This note was endorsed by the owners of the common stock of Palisades including Clifford, Sr. On April 9, 1959, Beatrice exchanged this $60,000 note for 600 shares of 5% preferred stock of Palisades. The preferred stock which Beatrice received in 1951 in exchange for the property in Palisades Park restricted payment of dividends for a certain period, which restriction was removed in 1955 and in that year Beatrice received $6,450 of dividends from Palisades on her preferred stock. In 1956 Beatrice received $500 of dividends from the stock which she had exchanged in December 1955 for a $60,000 note, and in addition received $2,750 of interest in that year on the note. In each of the years 1957 and 1958 Beatrice received $3,000 of interest from Palisades on her $60,000 note. In 1959 she received $1,000 in interest on her note and received $2,250 of dividends on the preferred stock which she received on April 9, 1959, in exchange for her $60,000 note. *222 In each of the years 1960, 1961, and 1962, Beatrice received $3,000 of dividends on her preferred stock in Palisades. In 1957 Rosario and Rose Martelli, husband and wife (hereinafter referred to as the Martellis) began construction of a motel located on Route 35, Wall Township, New Jersey, which motel became known as the Rose Motel. On March 24, 1958, Warwick granted to the Martellis a construction loan for $141,600 and the Martellis executed a bond and mortgage in that amount. After granting the construction loan, Warwick made several advances to the Martellis as construction of the motel proceeded and by December 30, 1958, had advanced to the Martellis a total amount of $131,769.50. The first advance was made on March 24, 1958, by checks totaling $46,336. Of this advance the Martellis returned $21,600 to Warwick as a mortgage discount commonly referred to as "points." On December 16, 1958, Warwick assigned the Martelli bond and mortgage to Beatrice in exchange for the cancellation of a loan Beatrice had previously made to Warwick. On July 29, 1958, the Martellis executed a bond and second mortgage for $25,000 on the Rose Motel to the American Lumber and Supply Company for material *223 furnished for the construction of the Rose Motel. On January 18, 1959, the American Lumber and Supply Company assigned its bond 554 and second mortgage to the 201 Bell Avenue Corporation for $18,650, the amount then due as principal and interest on the second mortgage. On January 27, 1959, the Martellis executed a bond and third mortgage for $12,000 on the Rose Motel to Beatrice. Advancements were made under this mortgage by Clifford, Sr., Beatrice, Campla, and Warwick. Repayments were made on the mortgage and on March 31, 1960 there was a remaining balance on the third mortgage of $408. On March 31, 1960, the 201 Bell Avenue Corporation filed a foreclosure action on its second mortgage on the Rose Motel in the Chancery Division of the Superior Court of New Jersey. On April 25, 1960, Beatrice was named a defendant in the mortgage foreclosure action and she joined in the mortgage foreclosure as the third mortgagee. At the time the 201 Bell Avenue Corporation commenced its foreclosure action on its second mortgage on the Rose Motel, the first mortgage was in default. The first mortgagee did not join in the foreclosure sale. On May 17, 1960, a judgment was entered in the foreclosure *224 action ordering that the Rose Motel be sold by the sheriff of Monmouth County to pay and satisfy the second mortgage in the sum of $18,966.80 and the third mortgage in the sum of $408. On August 1, 1960, the sheriff of Monmouth County, pursuant to the order of the Court, held a public sale of the property. Prior to the time the 201 Bell Avenue Corporation purchased the second mortgage on the Rose Motel from the American Lumber and Supply Company, the president of that company had attempted to purchase the Rose Motel property from the Martellis for that corporation. His offer to purchase the property was refused by the Martellis. Thereafter, the president of the 201 Bell Avenue Corporation found out that there was a second mortgage on the property owned by the American Lumber and Supply Company and took steps to acquire this mortgage for the 201 Bell Avenue Corporation and did acquire it in January 1959. Shortly after acquiring the mortgage he made demand for payment. When payment was not received he made further efforts to purchase the property and when these efforts proved unsuccessful proceeded to institute the procedures for foreclosure. The president of the 201 Bell Avenue Corporation *225 instituted the foreclosure proceedings with a view to negotiating in some way to purchase the property. In the latter part of 1959, prior to the commencement of the foreclosure proceedings, the president of the 201 Bell Avenue Corporation offered to purchase the property from the Martellis for $220,000. In his negotiation with the Martellis the president of the 201 Bell Avenue Corporation was informed that the Martellis had a great many debts in connection with the Rose Motel and were interested in getting sufficient money for the motel to pay all of those debts. The Martellis and the president of the 201 Bell Avenue Corporation were unable to agree on a precise amount which would pay all of the debts the Martellis believed had to be paid in connection with the Rose Motel. The Martellis had borrowed moneys from members of their families to use in the construction and furnishing of the motel. These debts were unsecured but the Martellis were desirous of obtaining a sufficient sum for the motel to pay off these debts as well as the debts secured by mortgages on the motel. Rosario Martelli had personally worked on building the motel and was of the opinion that its value was substantially *226 in excess of the construction costs since no charge to the property had been made for his work. After being unable to reach an agreement with the Martellis in the latter part of 1959 the president of the 201 Bell Avenue Corporation approached Clifford, Sr., to ascertain if some agreement could be reached with respect to modifying the terms of the first mortgage in the event the 201 Bell Avenue Corporation acquired the Rose Motel property. At that time the first mortgage was in default and absent some agreement with Clifford, Sr., payment in full could have been demanded. At the August 1, 1960 public sale of the property the president of the 201 Bell Avenue Corporation bid on the property, his top bid being around $21,500 for the property subject of course to the first mortgage and unpaid taxes. At the foreclosure sale the president of the 201 Bell Avenue Corporation gained the impression that someone was making bids on the property on behalf of the Heaths. He also gained the impression that Rosario Martelli had reached some agreement with the Heaths with respect to the property. The successful bidder for the property was Francis W. Lawley (hereinafter referred to as Lawley) who *227 was acting not for himself but in trust for another. His bid 555 was $22,000 and the property was sold at the public sale for $22,000 subject to the first mortgage. The reason the president of the 201 Bell Avenue Corporation ceased to bid on the property after making the bid of approximately $21,500 was because he believed, after seeing how the bidding was going, that some "deal" had been made between Clifford, Sr., and Rosario Martelli which would result in his inability to purchase the property at any price since the Martellis could bid any sum and, leaving out payments which might be required on the first mortgage which the Heaths controlled and possibly some back-due taxes, would have to pay only the amount of the second and third mortgages. When the president of the 201 Bell Avenue Corporation made the offer to the Martellis of $220,000 for the Rose Motel property, he had intended to pay cash above the first mortgage of approximately $141,000 on the property for a clear title to the property. He believed he could arrange for a loan to pay off the first mortgage if necessary. When he was bidding on the property at the forclosure sale and ceased bidding, he had become convinced *228 that he would be required to pay the entire first mortgage and back taxes in cash without ample time to make loan arrangements and was concerned whether his corporation would be in a position to make the payment. He was also of the opinion that it would be necessary for him to make improvements to the property to put it in prime operating condition which he estimated would run between $25,000 and $30,000. Two of the major improvements he felt would be necessary were a big highway sign and a swimming pool. He had experience in owning and building a number of motels in the general vicinity of the Rose Motel. He felt that without such a sign and swimming pool as well as certain other improvements, the motel could not be operated profitably. At the time of the foreclosure sale of the Rose Motel the Martellis had it listed for sale with real estate brokers at a price of $275,000. After the sale the Martellis made an agreement with the Heaths to pay them $5,000 if they would permit the Martellis to continue to occupy the motel for a month and attempt to sell the motel during the month they were occupying it. On August 27, 1960, an agreement was executed between the Martellis, Beatrice, *229 and Lawley. This agreement recited the fact that Beatrice was the present holder of the first mortgage on the Rose Motel, and that Lawley had bid the property in at the foreclosure sale on August 1, 1960 for $22,000. The agreement provided that the Martellis were granted permission to occupy the premises and attempt to make a sale thereof until October 1, 1960, in return for payment of $5,000 toward the $22,000 bid price for the property and that the surplus money from the $22,000 bid price at the foreclosure sale above that necessary to pay the second mortgage, the third mortgage and costs of the sale which was estimated at $1,500, would be assigned to Beatrice. This agreement also provided that if the Martellis deposited $30,000 with Lawley before October 1, 1960, they could keep possession of the motel until October 1, 1961, provided they paid $2,000 a month to Beatrice to be credited to payment of current taxes and interest and principal on the first mortgage. The $30,000 was to be used to pay back taxes, complete air conditioning of the motel and construct a swimming pool on the motel property. The agreement provided that Beatrice would use due diligence in attempting to sell *230 the motel for the benefit of the Martellis and would consider granting new financing to any bona fide purchaser procured for the property. Any amount of the purchase price not needed to pay the indebtedness on the property and in connection with the foreclosure sale thereof was to go to the Martellis. A sheriff's deed for the property was delivered to Lawley on August 12, 1960, and this deed was recorded by Lawley in the County Clerk's Office of Monmouth County on September 18, 1961. By deed dated August 12, 1960, which also was recorded in the Monmouth CountyClerk's office on September 18, 1961, the Rose Motel property was conveyed from Lawley to Clifford, Sr. The Rose Motel had an assessed value for real estate purposes as of August 1, 1960 of $5,200 for land, $78,100 for buildings, $12,700 for personal property and $100 for household items, making a total assessed value of $86,100. As of August 1, 1961, the total assessed value of the Rose Motel was $74,050. The equalization tables of the County of Monmouth authorized under New Jersey Statutes for the years 1960 and 1961 indicate that the ratio of assessed value of property to true value was 31.12 percent in 1960 and 29.71 *231 percent in 1961. The actual total cost of constructing the Rose Motel exclusive of land and furnishings, architects' fees, and interest and expenses during construction was 556 approximately $185,000. This cost includes an estimate of the wages which Rosario Martelli would have been paid for his work as a mason and carpenter in constructing the motel based on the hours of such work he did but no estimate for any supervisory work he did. The Rose Motel had 55 motel units and also an apartment for the manager. Construction costs in the area in which the Rose Motel was located ranged from $2,800 to $3,000 per motel room and bath during the years 1958 and 1959. During the period 1957 through 1965 sales were made of motels in the general area of the Rose Motel at prices ranging from $4,150 per unit to $5,800 per unit. Hotels in this area were to an appreciable extent a seasonal occupation and as such could expect full occupancy for a limited period. Based on occupancy of 70 days at $18 per day for 55 rooms, the resultant estimated gross income of this motel would be $69,300. The expense, other than any payment to the manager, based on the average rates paid by motels in the vicinity *232 but using the actual records on the Rose Motel for taxes for 1960, of operating the motel for the 70-day period would be somewhat in excess of $25,000, leaving an estimated income based on such figures of approximately $44,000. In 1960 Clifford, Sr., paid back-due real estate taxes on the Rose Motel of $8,768.63 which he deducted on his return as an ordinary and necessary business expense. Clifford, Sr., has a B.S. degree in Mechanical Engineering. He worked during the late twenties and early thirties in various positions as a mechanical engineer. He commenced his own business operations in the thirties and has operated successfully a number of various business enterprises. During the year 1954 Warwick sold four pieces of property for a total sales price of $69,510.65. The total cost of these properties was $56,438.81. On its 1954 income tax return Warwick reported gross sales of property of $61,000 and the cost of such property as $55,970, thereby understating its income by $8,041.84. In 1955 Warwick sold seven individual pieces of property for a total amount of $207,100. The cost of such properties including both the land costs and commissions paid on sale of the properties *233 was $171,159.38. On its corporate income tax return for the year 1955 Warwick reported gross sales of $201,800 and costs of sales at $183,995, thereby understating its taxable income by $18,135.62. In 1956 Warwick sold six individual pieces of property at a total sales price of $158,968.34. Its total cost including both land costs and commissions of such sales was $135,604.63. On its corporate income tax returns for 1956 Warwick reported gross sales of $125,300 and deducted costs with respect to such sales of $111,323.23, thereby understating its taxable income for the year 1956 by $9,386.94. For the year 1957 Warwick made sales of six individual pieces of property for a total sales price of $139,486.50. Its cost of these sales including land costs and commissions was $95,551.30. On its corporate income tax return for the year 1957 Warwick reported gross sales of $101,000 and deducted costs of such sales of $81,740, thereby understating its taxable income for 1957 by $24,675.20. In addition to the sales of $101,000 reported by Warwick on its 1957 return, Warwick reported interest income of $2,665.11, thereby reporting total gross income of $103,665.11 as compared to properly reportable *234 gross income of $142,151.61. Warwick's income tax returns for each of the years 1954 through 1957 were prepared by Clifford, Sr. In the year 1958 Warwick sold a piece of property for $22,500 but failed to include the amount in the sales reported on its 1958 Federal income tax return. For the year 1959 Warwick deducted repair expenses in excess of the repairs actually sustained of $712.50 and failed to report interest income of $2,300. For the year 1960 Warwick claimed a bad debt deduction for a debt of Heathcliff, Inc., of $1,500. In 1958 Warwick owned a piece of property in Rumson, New Jersey known as the Wehrle property. This property was conveyed by Warwick to Campla on September 15, 1958. On November 29, 1961, Campla conveyed this property to William Wehrle for a consideration of $46,500. The cost of the property to Warwick was $28,745.19. Although this sale was made in the name of Campla, Campla was acting in fact on behalf of Warwick and the sale was in fact a sale of Warwick and was not included in Warwick's gross sales in 1961. For the year 1961 Warwick claimed a bad debt deduction with respect to an indebtedness of Heathcliff, Inc., of $1,920. For the year 1962 Warwick *235 overstated its deduction for interest expense by $1,546.60. Campla on its Federal income tax return for the calendar year 1959 understated its sales income by $2,652.46 and overstated its 557 costs by $16,050, resulting in a total understatement of its income for that year of $18,702.46. For the year 1960, Campla on its Federal income tax return understated its sales by $26,820, and in 1961 on its Federal income tax return it overstated its construction costs by $28,745.19, which resulted from its deducting the $28,745.19 cost of the Wehrle property which was in fact the property of Warwick. In 1962 Campla overstated its interest expense by $3,221.76. Respondent in his notice of deficiency to Clifford, Sr., for the years 1959 through 1963 made the following adjustments which still remain in issue: 1959
Disallowance of expenses for amount paid to Clifford, Jr.
$13,544.55
Interest deduction disallowed
2,142.68
Total
$15,687.23
1960
Back taxes paid on Rose Motel
$ 8,768.63
Claimed bad debt of Heathcliff, Inc.
2,000.00
Total
$10,768.63
1961
Claimed bad debt loss of Heath-cliff, Inc.
$18,080.29
Depreciation on automobile
448.92
Sales omitted
2,000.00
Legal fees
1,279.50
Bad debt
[1] 732.70
$22,541.41
1962
Business income increased because of disallowance of deduction
$28,721.44
with respect to property of Campla and Warwick
1963
Net operating loss carryover de-duction
$36,209.60
Additional income from Warwick Motor Lodge
4,145.47
Total
$40,355.07
*236 Respondent in the notices of deficiency computed Clifford, Sr.'s taxes on the basis of a married person filing a joint return but by amended answer alleged that they should be computed on the basis of a married person filing a separate return for each of the years 1959 through 1962. Respondent also by amended answer alleged in the alternative that the income as reported by Clifford, Sr., should be increased by the amount of income which he had determined for each of the years 1959 through 1962 to be income of Beatrice in the event we should determine the returns filed by Clifford, Sr., to be joint returns. Respondent in his notices of deficiency to Beatrice determined that she had filed no returns for any of the years 1954 through 1962. He determined that Beatrice had total income for the years 1954 through 1962 as follows: Year
Amount
1954
$ 4,500.00
1955
12,340.00
1956
7,038.15
1957
8,525.00
1958
147,000.00
1959
11,782.36
1960
112,624.61
1961
6,341.40
1962
7,718.36
*237 For 1954 Beatrice's total income as determined by respondent consisted of interest from Warwick. For 1955 Beatrice's income as determined by respondent consisted of interest from Warwick plus $6,750 of dividends from Palisades less the $50 dividend exclusion. For 1956 the income as determined by respondent for Beatrice consisted of interest from Warwick plus $2,750 of interest from Palisades plus $500 of dividends from Palisades less the $50 dividend exclusion. For 1957 the income of Beatrice as determined by respondent consisted of interest from Warwick plus $3,000 of interest from Palisades and her income as determined by respondent for 1958 likewise consisted of these two items. For 1959 the income of Beatrice as determined by respondent consisted of $6,000 of "points" on the Martelli mortgage, $2,250 of dividends from Palisades less the $50 dividend exclusion, $1,000 of interest from Palisades, and various amounts of interest from various individuals. For 1960, 1961, and 1962, Beatrice's income as determined by respondent consisted of interest from Campla plus $3,000 of dividends from Palisades in each year less the $50 dividend exclusion and for the year 1960 a gain of $90,632.37 *238 on the foreclosure sale on the Rose Motel. Respondent by amended answer alleged that if we should determine that Beatrice filed a joint return with Clifford, Sr., for the years 1959 through 1962, then Beatrice's income as determined by him should be increased by the income of Clifford, Sr., reported on Clifford, Sr.'s return plus the increases in income he determined against Clifford, Sr., and the tax computation should then be made on the basis of a married person filing a joint return. 558 Respondent in his notice of deficiency to Warwick made the following adjustments which are still in issue: 1954
Additional income from sales of property
$ 8,041.45
1955
Additional income from sales of property
18,035.62
1956
Additional income from sales of property
24,675.31
1957
Additional income from sales of property
38,486.50
1958
Additional income from sales of property
22,500.00
1959
Deduction for repair expense disallowed
712.50
Disallowed deduction of interest expense
2,300.00
1960
Claimed bad debt deduction of Heathcliff, Inc.
1,500.00
1961
Additional income from sales of property
46,500.00
Claimed deduction for bad debt of Heathcliff, Inc.
1,920.00
1962
Disallowed deduction for inter- est expense
1,546.60
*239 Respondent determined that part of Warwick's understatement of tax for each of the years 1954 through 1962 was due to fraud with intent to evade tax but has now conceded this issue as to the years 1958 through 1962. Respondent determined that the deficiencies he determined for the years 1954 through 1957 were not barred by the statute of limitations since the returns filed by Warwick for those years were false and fraudulent. In his amended answer he alleges in the alternative that the 6-year statute is applicable to the year 1957 since the gross income of Warwick for that year was understated by more than 25 percent. Warwick's 1957 return was filed on March 4, 1958 and the notice of deficiency was mailed on March 12, 1964. March 15, 1958 was the statutory filing date. Respondent in his notice of deficiency to Campla for the taxable years 1958 through 1962 made the following adjustments which are still in issue: 1959
Additional sales income
$ 2,652.46
Decrease in cost of goods sold
16,050.00
1960
None
1961
Decrease in deduction claimed for construction costs
28,745.19
1962,lDecrease in interest expense de-duction claimed
3,221.76
In the petitions in *240 each of these cases all adjustments determined by respondent in his notices of deficiency were placed in issue but at the trial certain stipulations were entered into between petitioner and respondent which in fact amounted to concessions of certain issues by petitioners. No evidence was introduced on other issues. Petitioners filed no brief and therefore we do not have the benefit of their views with respect to the issues remaining in the case at this time. [7]
Respondent in his brief conceded a number of issues which *241 had been raised by the pleadings. Opinion All of the issues here are purely factual. If the returns filed in the name of Clifford, J. Heath for the years 1954 through 1962 were joint returns of Clifford, Sr., and his wife, Beatrice, then the deficincies determined by respondent against Beatrice for the years 1954 through 1958 are barred by the statute of limitations. However, in this situation the deficiencies against both of these petitioners for the years 1959 through 1962 should be based on the combined income of both petitioners, computing the tax liability on the basis of a joint return of husband and wife. The result, of course, will be duplicate determinations of the same amount of deficiency against each Clifford, Sr., and Beatrice for the years 1959 through 1962, which deficiencies respondent will be entitled to collect only once. It is well settled that a determination of whether income tax returns are joint or separate returns of a husband and wife is a question of fact to be determined by all of the evidence. Muriel Heim, 27 T.C. 270 (1956), affirmed 251 F. 2d 44 *242 (C.A. 8, 1958). The fact that the income of both the husband 559 and wife was included in the returns filed only in the name of one of them standing alone is not sufficient to show that the return was a joint return. However, this fact along with other evidence sufficient to show an intent on the part of both the husband and wife to file a joint return is sufficient to support the conclusion that a joint return was filed. The ultimate determination to be made is the intent of the parties. O'Connor v. Commissioner, 412 F. 2d 304 (C.A. 2, 1969), affirming a Memorandum Opinion of this Court. The facts here show that a high percentage of Beatrice's income for each of the years 1954 through 1962 was included in the returns filed by Clifford, Sr. In fact the items of income which were not included are primarily those which both Beatrice and Clifford, Sr., claimed at some point did not constitute income of either of them. While we, as will hereinafter be explained, do not agree with many of the contentions of Clifford, Sr., and Beatrice with respect to items of income, we do nevertheless agree that the evidence shows that most of the amounts which they recognized to be *243 income of Beatrice were included in the returns filed in the name of Clifford, Sr. An exemption was claimed for Beatrice on each of the returns and on many her name appeared at some place on the return. Both Clifford, Sr., and Beatrice unequivocally testified they intended the returns to be joint returns. Respondent in his notice of deficiency to Clifford, Sr., for the years 1959 through 1962 computed his tax on the basis of a married person filing a joint return and only raised the issue with respect to whether the returns made in the name of Clifford, Sr., for these years were joint returns by amendment to his answer. For the years 1954, 1956, 1957, and 1958 the returns filed by Clifford, Sr., reported income received by Beatrice as interest from Warwick. These returns also reported dividend income of Beatrice. The only item for any one of these years which was omitted from these returns was interest and dividend income of Beatrice from Palisades. For the year 1954 the only item of income which respondent determined Beatrice had was interest from Warwick. In 1956, 1957, and 1958 respondent determined that Beatrice had, in addition to income from interest from Warwick, interest *244 income from Palisades and for the year 1956 determined that she had $500 of dividend income from Palisades. While we agree that Beatrice did have interest income from Palisades in 1956, 1957, and 1958 and have so found, the omission of this income from the returns is not persuasive to us that Beatrice and Clifford, Sr., did not intend to include all income of both parties in the returns filed. The note which Beatrice obtained from Palisades in exchange for her preferred stock was guaranteed by all the stockholders of the company and apparently she and Clifford, Sr., did not consider the $3,000 in 1957 and 1958 and the $2,750 in 1956 which respondent determined to be income to Beatrice from interest from Palisades was in fact income to the two of them. Considering the evidence as a whole we have concluded that the returns filed only in Clifford, Sr.'s name were joint returns of Beatrice and Clifford, Sr. Respondent has, of course, conceded that the 1955 return was such a joint return. We therefore hold that any deficiency against Beatrice for the years 1954 through 1958 is barred by the statute of limitations. On the return filed by Clifford, Sr., for the year 1959 he deducted as *245 a business expense of his sole proprietorship, Precipitation Associates of America, the amount of $13,544.55 as salary paid to his son. The record shows that in fact the amount of the payments was based on the amount of the personal needs of Clifford, Jr., and his family for living expenses as distinguished from the value of any services rendered by Clifford, Jr., to his father. However, the record does show that Clifford, Jr., did in fact render some services to his father's business of selling dust control equipment during the year 1959. On the basis of the evidence as a whole, we have concluded that a reasonable salary for the services rendered by Clifford, Jr., to his father's business during the year 1959 is $3,500 and therefore we hold that Clifford, Sr., was entitled to deduct this amount and sustain respondent's disallowance of the claimed deduction to the extent of $10,044.55. Clifford, Sr., claimed on his 1960 income tax return a deduction for real estate taxes paid of $8,768.63. These taxes were paid in connection with bidding in of the Rose Motel. Respondent in his notice of deficiency disallowed as a deduction for taxes or expenses of operating the Rose Motel [8] the *246 amount of $8,768.63. However, 560 respondent did allow the $8,768.63 as additional cost of the Rose Motel and on brief states that if the bid-in of the Rose Motel results in income to Clifford, Sr., or Beatrice, this amount should be added to the basis of the property. It is difficult from the facts here to determine whether in substance Beatrice or Clifford, Sr., bid in the Rose Motel. However, it is clear that one or the other did and since we have held that the returns filed for the years here in issue were joint returns, the amount of income, if any, from bidding in this property is income to Beatrice and Clifford, Sr., on their joint returns. We agree with respondent that he properly disallowed the $8,768.63 as a deduction and that this amount should be included in the basis of the motel in determining the gain or loss from bidding in of the property. We have found nothing in this lengthy record to show that Clifford, Sr., made loans in the amount of $20,080.29 to Heathcliff, Inc. It is possible that certain of the property transactions which were testified to as being made by Clifford, Sr., could *247 in some way be interpreted as loans to Heathcliff, Inc., since apparently there were interchanges of property between Clifford, Sr., and Heathcliff, Inc. However, if any loans were made by Clifford, Sr., to Heathcliff, Inc., there is no evidence in the record that these loans became worthless to the extent of $2,000 in 1960 and $18,080.29 in 1961. It appears from the record that the creditors of Heathcliff, Inc., did receive payment for their claims to some undisclosed extent. In any event the evidence in this record is insufficient to show that Clifford, Sr., is entitled to the claimed deductions. There is lidewise no evidence in this record to show that respondent erred in disallowing $2,142.68 of interest expense claimed by Clifford, Sr., to be deductible in 1959 and $448.92 of depreciation claimed by Clifford, Sr., as a deduction in 1961, and we sustain respondent's disallowance of these amounts. Likewise, Clifford, Sr., has failed to show that respondent did not properly disallow a claimed deduction in 1961 for legal fees of $1,279.50 and add this amount to the basis of the motel property which was bid in at the mortgage sale in 1960. The record does not show why the legal *248 fees were paid or if in fact they were paid. However, since respondent added these fees to the basis of the Rose Motel property, he apparently concedes that the fees were paid. We sustain respondent on the issue. We sustain respondent's increase of Clifford, Sr.'s income in the year 1962 by $28,721.44 which consisted of the cost of certain land and certain buildings owned by Warwick and certain costs incurred by Warwick and Campla. It appears from the record that these costs were claimed by Clifford, Sr., and by Campla and Warwick and that respondent allowed the cost as deductions to Campla and Warwick in computing their taxable incomes for 1962. There is nothing in the record to show error in respondent's treatment of these items of cost and we sustain respondent. Likewise petitioners have introduced no evidence to show error on the part of respondent in increasing Clifford, Sr.'s income in 1961 by $2,000 representing an omission from sales of Precipitation Associates of America. This resulted from respondent's increase in value of inventory transferred by Clifford, Sr., to his son and his daughterin-lsw, Barbara, when he sold the Precipitation Associates of America business to *249 them. Since petitioners have failed to show error in respondent's adjustment of the sales of Precipitation Associates of America for the year 1961 we sustain respondent's determination. Petitioner made no showing of how Clifford, Sr., computed the loss carryover deduction of $36,209.60 he claimed in 1963 or that respondent did not properly increase his net profits from the operation of the Warwick Motor Lodge in that year from $373.03 to $4,518.50. We therefore sustain respondent's determination in this respect. Likewise, Clifford, Sr., has not shown error in respondent's determination of the addition to tax for negligence for the year 1963 and we therefore sustain this determination of respondent. The only argument which respondent makes with respect to Clifford, Sr.'s return for 1959 being false and fraudulent is his deduction of the $13,544.55 paid on behalf of his son in that year. We agree with respondent that only a small portion of this amount was properly deductible as an ordinary and necessary business expense by Clifford, Sr., in that year and have so held. However, the claiming of a deduction of an excessive salary even though paid in effect to support a son and his *250 family standing alone is not the clear and convincing 561 evidence of fraud required of respondent to sustain his burden of showing that a part of an underpayment of tax is due to fraud. The evidence supports the conclusion that Beatrice for the years 1959 through 1962 received all items of income which respondent determined she received, except the total $90,632.37, resulting from the bid-in of the Rose Motel, which respondent determined she received in 1960. We therefore hold that the joint income of Clifford, Sr., and Beatrice should be increased for the years 1959, 1961, and 1962 by the amounts determined by respondent to be income of Beatrice, except to the extent these items of Beatrice's income were included in the income reported on the returns filed by Clifford, Sr. We have set forth in our findings the items of Beatrice's income reported on the returns filed in the name of Clifford, Sr. As we have set forth in our facts the $3,000 of dividends received by Beatrice from Palisades in 1960 were reported on the return filed by Clifford, Sr., as "receipt of interest." Therefore, this amount should not again be included in Clifford, Sr.'s and Beatrice's income for 1960 *251 even though incorrectly designated in the return as filed. This same is true with respect to 1961. In 1960 and 1962 there was reported on the returns filed in the name of Clifford, Sr., interest from David Randall and Barnard J. Johnson which may be a duplication of the interest shown by respondent in his notice of deficiency to have been received by Beatrice in 1959. However, the evidence is insufficient to warrant such a holding, and we therefore assume that the interest received from these persons in 1959 by Beatrice was in addition to the interest received from these sources in 1960 and 1961 even though respondent did not include in his determination of Beatrice's income any interest received from these persons in 1960 and 1962. This brings us to the final issue with respect to the computation of the income of Clifford, Sr., and Beatrice, that is the amount, if any, of income received by them in 1960 from the foreclosure of the Rose Motel. The parties stipulated that Lawley was acting not for himself but in a trust capacity for some other person. Petitioners would not stipulate for whom Lawley was acting. However, from the facts, it is clear that he was acting either for Clifford, *252 Sr., or Beatrice or both of them. While we are inclined to the view from such facts as are here present that Lawley was acting for Beatrice, since we have determined that Beatrice, and Clifford, Sr., filed joint returns for the year 1960, it is relatively unimportant for which of them Lawley was acting. The first mortgage on the Rose Motel was actually held in Beatrice's name, having been assigned to her by Warwick on December 16, 1958. The record shows that in fact Clifford, Sr., controlled what was done with respect to the mortgage when it was held by Warwick as well as when it was held by Beatrice. So Beatrice may have held the mortgage in her name when in fact it belonged to Clifford, Sr. It is well recognized that a person may realize gain or loss when he buys in property on which he holds a mortgage. Section 1.166-6, Income Tax Regs., specifically deals with this situation. This regulation provides that where the creditor buys in the mortgaged or pledged property, gain or loss is realized, measured by the difference between the amount of the obligations of *253 the debtor which are applied to the purchase or bid price of the property and the fair market value of the property; and that the fair market value of the property is presumed, in the absence of clear or convincing proof to the contrary to be the amount for which it is bid in by the taxpayer.[9] A regulation substantially the same as section 1.166-6 of the Income Tax Regs. has been in effect for many years. This regulation has received approval of the courts. Commissioner v. West Production Co., 121 F. 2d 9, 12 (C.A. 5, 1941), affrming on this issue 41 B.T.A. 1043 (1940). Our question here therefore is the factual one of whether in this case we have the clear and convincing proof required by the regulation that the Rose Motel had a fair market value in excess of the price at which it was bid in at the foreclosure sale. We conclude from all the evidence that this 562 record does contain such clear and convincing proof. *254 The bid price of the property was $22,000 subject to the first mortgage. The first mortgage was $141,600 which was unpaid at the time of the foreclosure sale to the extent of approximately $130,000. There were unpaid back taxes of $8,768.63 so that the bid price would come to approximately $160,768.63. The evidence shows that there had been a firm offer to the Martellis to buy this property shortly before the foreclosure sale for $220,000, which offer had been turned down since the Martellis wanted to get a sufficient amount from the sale of the property not only to pay the indebtednesses that were outstanding in the form of mortgages and taxes on the property, but also to repay unsecured loans which they obtained from relatives. The record shows that the cost of building the motel was in excess of the bid price without considering the cost of the land and furnishings which were included in the sale of the motel. The evidence further shows that when the ratio of assessed value to true value of property in New Jersey is applied to the assessed value of the property the computed value in 1960 is over $275,000 and in 1961 over $249,000. The record also shows that the Martellis had some *255 agreement with the Heaths with respect to making a negotiated sale of the property if the property were bought in by the Heaths. For this reason the amount bid for the property by the Heaths had no more relation to the fair market value of the property than the bid price of an owner bidding in the property to which he had title. Finally, respondent offered the testimony of an expert witness who gave as his opinion that the value of the motel property on August 1, 1960, when it was bid in for Beatrice was $240,000. This expert was well qualified to appraise motel property in the area of New Jersey in which the Rose Motel was located. He had been a real estate appraiser for 40 years, was a member of many societies of appraisers and was a licensed real estate broker of the State of New Jersey. He had lectured at the American Institute of Real Estate Appraisers in Newark, New Jersey and had taught at Rutgers University. He was Dean of the Appraisers School at Newark from 1948 through 1950. He had made appraisals for the Federal Government, the State of New Jersey, the Port Authority of New York, and many municipalities in New Jersey as well as for private individuals, insurance companies, *256 oil companies, banks, and other business organizations. In making his appraisal he considered sales of comparable p properties near the date of the sale of the Rose Motel, the income which might be expected to be generated by the property, and the cost of construction of the property. On the basis of this record we conclude that the appraisal made by respondent's expert witness is accurate and well supported. Clifford, Sr., testified that he had been in the real estate business for many years and that in his opinion the fair market value of the Rose Motel when he and Beatrice bid it in at the foreclosure sale was less than $100,000. He stated the condition of the motel was poor. He also stated that he based his determination on the basis of 3 1/2 time gross rentals which he said had been only $26,000 in 1961. However, he also testified that work was being done to improve the motel in 1961 which caused difficulty in leasing rooms at times. There is nothing in the record to show that if in fact $26,000 were the gross rentals in 1961, this amount was the amount of gross rental under normal operations. There is much in the record to discredit Clifford, Sr.'s estimated value of under *257 $100,000. If in fact he believed this to be the value of the motel, he would have let the other bidder have it and received payment in full on his mortgage. All the creditable evidence of record supports a value well over twice $100,000 and no objective evidence, a value that low. On the basis of the evidence of record here and after consideration of all the facts, we hold that the fair market value of the Rose Motel at the date it was bought in on behalf of Beatrice or Clifford, Sr., was $240,000. On the basis of using $240,000 as the fair market value of the property on August 1, 1960, respondent arrives at a gain on the property on the foreclosure of $60,632.37 which he now contends is the proper gain instead of the gain of $90,632.37 set forth in his notice of deficiency to Beatrice and alleged alternatively. [10] 563 However, in arriving at the amount of gain of $60,632.37, respondent did not, as he did in his notice of deficiency, consider the $1,279.50 legal fee paid in connection with the foreclosure sale as a part of the cost of the property. We therefore hold that the gain realized by Clifford, Sr., or Beatrice or the two of them jointly on the bid-in of the Rose Motel *258 in 1960 was $59,352.87 ($60,632.37 - $1,279.50). Respondent contends that we should sustain his determination of additions to tax under section 6654 due by Beatrice for the years here in issue. Section 6654 provides for additions *259 to tax for failure by an individual to pay estimated income tax. Since we have held that any tax which would otherwise have been due by Beatrice for the years 1954 through 1958 is barred by the statute of limitations, any addition to tax under section 6654 for these years is likewise barred. For the years 1959 through 1962 respondent determined no comparable additions to tax against Clifford, Sr. However, there is nothing in this record to show that either Clifford, Sr., or Beatrice or the two of them paid any estimated income tax. In fact, the clear inference from the record is that they did not since on none of the returns filed by Clifford, Sr., which we have held to be joint returns of Clifford, Sr., and Beatrice, is there shown any payment having been made of estimated tax either by withholding or otherwise. Under these circumstances we conclude that Beatrice has failed to show that respondent was in error in determining that she is liable for additions to tax under section 6654. However, since respondent has made no allegation with respect to additions to tax under section 6654, should we conclude that Beatrice and Clifford, Sr., filed joint returns, the amount of the additions *260 will be limited either by the amount of tax computed on the basis of joint returns being filed by Beatrice and Clifford, Sr., with adjustment for respondent's concession and our determination of the various issues respecting income and deductions, or the amount determined for each year as additions to tax under section 6654 against Beatrice in respondent's notice of deficiency, whichever amount is less. The additions to tax under section 6654 as determined by respondent against Beatrice in his notices of deficiency were $84.03, $2,181.31, $32.89, and $44.16 for the years 1959, 1960, 1961, and 1962, respectively. The stipulated facts show that Warwick understated its income or overstated its deductions for each of the years 1954 through 1962. Respondent contends that this alone is sufficient to sustain his determination of fraud for the years 1954 through 1957. He has conceded he was in error in determining the addition to tax for fraud for the years 1958 through 1962. While, as respondent points out, this Court has held that consistent understatement of income over a number of years is *261 evidence of fraud, a showing of understatement of income alone is not sufficient in a case such as the present case to constitute the clear and convincing evidence of fraud necessary to sustain a determination of fraud by respondent. The evidence in this case shows extremely poor bookkeeping on the part of all petitioners. However, in certain years costs were understated and in other years costs were overstated. Also, petitioners' method of bookkeeping was such that it is very difficult to determine whether one of the individual petitioners or one of the corporate petitioners actually owned a certain piece of property and was therefore responsible for reporting the profit on the sale of that property. At times one of the individual petitioners would claim a deduction or report income which either the parties have now conceded or we have determined was properly the income of one of the corporations. The facts here show negligence in the bookkeeping of the corporate as well as the individual petitioners but negligence is not fraud. Considering all the facts in this case we conclude that respondent has not sustained his burden of showing that the returns of Warwick for the years 1954 *262 through 1957 were false and fraudulent. For this reason we sustain petitioners in their contention that the amount of any deficiency against Warwick for the years 1954 through 1956 is barred by the statute of limitations. Respondent in the alternative alleged with respect to the year 1957 that the deficiency 564 asserted was timely under the 6-year statute of limitations provided for in section 6501(e). [11] The statutory notice of deficiency was mailed to Warwick on March 12, 1964, which was within 6 years from March 15, 1958, the due date of Warwick's return for the calendar year 1957. The record shows that Warwick reported on its return for 1957 gross sales of $101,000 and in addition reported interest income of $2,665.11. The parties stipulated that Warwick had sales of $126,486.50 for the year 1957 which should have been reported and that this amount did not include a $13,000 sale to John G. and Mary Lu Talbot. The evidence in this case clearly establishes this $13,000 sale. The closing statement showing Warwick as the seller and the deed and mortgage with respect to the property sold by Warwick to John G. and Mary Lu Talbot are in evidence. There is no evidence in the record *263 in contradiction of these documents. Therefore, the gross receipts which should have been reported by Warwick for 1957 from sales of property are $139,486.50. It is clear that Warwick for the year 1957 omitted from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income reported on the return. We therefore hold that the deficiencies in Warwick's income tax for 1957 are not barred by the statute of limitations. *264 We have set forth in our findings the amount of sales by Warwick in the years 1957 through 1962 which we have found from the evidence in the record. Petitioner offered no evidence to show error on the part of respondent in disallowing a deduction of a claimed item of repairs of $712.50 or an item of interest of $2,300 in 1959 or in disallowing a claimed bad debt deduction for a debt owed to Warwick by Heathcliff, Inc., in each of the years 1960 and 1961 or in disallowing an interest expense deduction of $1,546.60 in 1962. We therefore sustain respondent's determination in these respects for failure of proof on the part of petitioners. Respondent determined additional sales and decreases in costs of sales of Campla for the years 1959 through 1961 and disallowed interest expense deductions of Campla in 1962 in the amounts which we have set forth in our findings. Petitioners offered no evidence to show any error in respondent's adjustments in Campla's income in these respects and in effect conceded certain of them to be proper. For the year 1961 respondent disallowed construction costs claimed by Campla of $28,745.19 which costs respondent stated to be applicable to Warwick. Campla *265 has shown no error in this disallowance and respondent has allowed the deduction to Warwick. We sustain the deficiencies determined by respondent against Campla for the years 1959, 1961, and 1962. Respondent has conceded that he overstated Campla's sales income in the notice of deficiency by $26,820 in the year 1960. Therefore, the result is no deficiency in 1960 since this increase in sales income was the only adjustment made by respondent to Campla's income in 1960. Respondent has conceded that he erred in determining an addition to tax for fraud against Campla for all of the years here in issue. Decisions will be entered under Rule 50. 565 Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Warwick Corporation, Docket No. 1880-64; Campla Corporation, Docket No. 1881-64; Clifford J. Heath, Docket No. 5342-67; Beatrice H. Heath, Docket No. 1273-68; and Beatrice H. Heath, Docket No. 1274-68.↩
2. The alternative increased deficiencies claimed are on the basis that Clifford J. Heath filed joint returns with his wife, Beatrice H. Heath, for these years.↩
3. Respondent conceded that petitioner Clifford J. Heath was not liable for additions to tax for fraud for the years 1960 through 1962, that petitioner Beatrice H. Heath was not liable for any deficiency or addition to tax for the year 1951 and was not liable for any addition to tax for fraud in any year. Respondent conceded that petitioner Warwick Corporation was not liable for any addition to tax for fraud for the years 1959 through 1962, and that petitioner Campla Corporation was not liable for addition to tax for fraud for any year involved in this case. In addition respondent conceded a number of items in each case which to some extent removed duplication of items charged to more than one taxpayer. In addition to a number of small items conceded by respondent, he conceded that petitioner Clifford J. Heath did not obtain a preferential distribution from Warwick Corporation in the amount of $225,000 in the year 1961. ↩
4. Respondent at the trial conceded that the income tax return for 1955 was a joint return of petitioners Clifford J. Heath and Beatrice H. Heath. On brief, however, he does not concede that any tax due from Beatrice H. Heath for the year 1955 is barred by the statute of limitations. This apparently was an oversight since respondent in no way contests petitioners' contention that any tax which might be due from Beatrice H. Heath for any of the years 1954 through 1958 is barred by the statute of limitations if she and Clifford J. Heath filed joint returns for those years. ↩
5. Respondent's determination is made on the basis that Beatrice H. Heath filed no income tax return for any of these years, which she did not unless the returns filed in the name of Clifford J. Heath are considered to be joint returns. Respondent at the trial conceded that the 1955 return was a joint return. Respondent, therefore, apparently has conceded that any deficiency due from Beatrice H. Heath for the year 1955 is barred by the statute of limitations and that any deficiencies for the years 1954, 1956, and 1957 are barred if the returns filed in the name of Clifford J. Heath for these years are joint returns of Clifford J. and Beatrice H. Heath. ↩
6. The parties stipulated the sales of Warwick Corporation with the exception of certain contested items and the cost of those sales. This stipulation shows either understatement of sales or overstatement of costs in each of the years 1954 through 1962. Respondent for the years 1957 and 1961 claimed additional sales of $35,500 and $46,500 with which petitioner Warwick Corporation did not agree. Also the parties were not in agreement as to the cost of the additional sales, if in fact they were additional sales of Warwick Corporation.↩
1. It is not clear whether this item was placed in issue in the petition but if it were, there is no evidence in the record to support the claimed deduction. Apparently the deduction was claimed in connection with a claimed operating loss on the Warwick Motor Lodge and disallowed by respondent in reducing the amount of that loss.↩
7. At the conclusion of the trial, the parties requested that seriatim briefs be filed with the petitioners filing the opening brief. The Court then granted petitioners until June 15, 1970 to file their opening brief, respondent until August 17, 1970 to file his brief in answer, and petitioners until September 17, 1970 to file their reply brief. Petitioners obtained several extensions of time to file their brief. After the expiration of the last extension so obtained, petitioners informed the Court they would file no brief. Respondent was then granted time within which to file his brief which was filed within the time allowed as extended upon respondent's motion.↩
8. The Heaths changed the name of this Motel to the Warwick Motor Lodge.↩
9. Sec. 1.166-6(b), Income Tax Regs., Realization of gain or loss - (1) Determination of amount. If, in the case of a sale described in paragraph (a) of this section, the creditor buys in the mortgaged or pledged property, loss or gain is also realized, measured by the dirrerence between the amount of those obligations of the debtor which are applied to the purchase or bid price of the property (to the extent that such obligations constitute capital or represent an item the income from which has been returned by the creditor) and the fair market value of the property. (2) Fair market value defined. The fair market value of the property for this purpose shall, in the absence of clear and convincing proof to the contrary, be presumed to be the amount for which it is bid in by the taxpayer.↩
10. Respondent computes this gain as follows Fair market value of the motel on August 1, 1960
$240,000.00
First mortgage
$141,600.00
Back taxes paid
8,767.63[ sic]
Cash bid in
$ 22,000.00
Third mortgage
12,000.00
$184,367.63
Martelli contribution
$ 5,000.00
Net cost to petitioners
$ 179,367.63
Gain on foreclosure
$ 60,632.37 Respondent does not explain why he includes as basis the $12,000 mortgage which had been paid down to approximately $400 at the time of the sale or the original amount instead of the unpaid balance on the first mortgage. However, we consider respondent's contention on brief as a concession on his part. However, respondent did not in his brief consider as part of the cost of the motel the legal fee of $1,279.50 which in his notice of deficiency he stated was added into the basis of the property.↩
11. Sec. 6501(e) Substantial Omission ofitems. - Except as otherwise provided in subsection (c) - (1) Income taxes. - In the case of any tax imposed by subtitle A - (A) General rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph - (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.↩